The next case we'll hear this morning is Chappell v. TruckPro. Whenever you're ready, Mr. Callaway, we'll hear from you. Good morning, Your Honor, and may it please the Court. Jordan Callaway on behalf of the appellant, Ernest Chappell. The key issue in this case is whether a reasonable jury could conclude that the faulty cab guard likely passed through the hands of TruckPro on its way to reaching the logging truck driven by Christopher Chappell. The evidence shows that TruckPro is by far the most likely distributor of this cab guard. Pictures of the cab guard itself show exactly where it originated, with a company called Rogear, and even the precise day where it came off the assembly line, April 4, 2008. From there, Rogear's records show that this was manufactured as part of a small, discrete batch, likely of only 12 units, 10 of which were shipped directly to TruckPro. From there, within days of receiving them, Rogear, excuse me, TruckPro then began to ship Rogear cab guards to multiple South Carolina buyers within the month, and then continued to do so over the next three months of that same year. The district court concluded that none of this was sufficient to get the case to a jury, but only after misinterpreting both South Carolina's substantive standard and the evidence requirements in order to show that a distributor was linked to an allegedly defective product. This court should reverse, both because of the evidence in the record and because the district court's ruling threatens to quietly rewrite South Carolina products liability law. I'd like to start with the evidence in the record that links TruckPro to the subject cab guard. There are multiple pieces of strong evidence. I think we understand that. The question, I think, and it's a very interesting question that's been subject to debate, is you have evidence that 10 units went to TruckPro and two units went to another distributor, but you can't determine whether the cab guard in this case, which course it took. And even after, if it went to the other place, what was it, Mobile? TrailMobile. Yeah, TrailMobile. If it went there, you don't quite know the course it went anyway. But your supposition is that because TruckPro got 10 as opposed to two, it's more likely than not it is the proper defendant. And the question is, the theory is sort of a preponderance of the evidence as to who the defendant should be in this case. And I'm not sure general jurisprudence has done that. I mean, if you change the numbers and you say, okay, six went to one distributor and seven went to TruckPro, you would argue still that because seven is more than six, a preponderance of the evidence is more likely than not TruckPro should be the defendant. But you really need some evidence to prove it was TruckPro. Otherwise we will be bringing defendants into litigation just based on statistics. And, Your Honor, I want to make an important point. We're not just relying on the 10 versus 2. I think the 10 versus 2 is an extraordinarily important piece of evidence here, but it's not the only one. The other evidence we have are, and there's no response to this on the other side in their brief, that we have records from TruckPro showing sales of road gear cab guards to South Carolina buyers within days of them receiving these 10. There are no evidence whatsoever that TrailMobile ever sold a road gear cab guard to a South Carolina buyer. There's no evidence whatsoever offered by TruckPro to suggest that they're not responsible for this. Actually, it's even a little more remote because the owner of the truck, there was evidence that he bought used cab guards from other truckers. But, Your Honor. And a majority of them. There's just really no evidence that you can say. Let's assume there were 51 cab guards that went to TruckPro and 49 went to other persons. There is just no evidence to say that it was the 51 as opposed to the 49, except that 51 is a greater number than 49. No, I disagree with that, Your Honor. Well, I know you do. Because I don't think it gives account for the fact that we do have this connection between TruckPro and South Carolina, the area where this incident took place, and there is no such connection when it relates to TrailMobile. I think that's one important piece. I think it's also very different, 51, 49 versus 10 versus 2. No, it is not under your theory. Your theory relies on a preponderance of the evidence, and you kept using in your brief the word causation, which it's not a causation issue at all. It's the identification of a defendant. Well, but I think the identification of the evidence of the defendant relates to the cause and fact element of our claim. Well, in a big picture, who caused your injury it is. But causation is what causes the accident, and that is always determined by a preponderance. But who the defendant is, you have to have some evidence to link it to a particular defendant. Just because statistics show that it's a greater chance that one defendant would be more likely to be the proper defendant, it would be a strange tort system if we were allowed lawsuits just based on statistics like that. I would make a note to you, Your Honor, to the case of McCoy v. Upstate Lung, where a South Carolina court of appeals relied on an expert opinion that said just based on the 95 percent probability that tumor one led to tumor two was sufficient to get past the directed verdict. That's a causation issue, and your brief did this again and again. You spent almost all the time talking on what caused an injury. In other words, you have an accident. There's multiple causes often, and the question is causation is subject to be presented to the jury, and the jury makes findings and facts of what caused. But here we're identifying a defendant who's responsible, and the question is can you identify a defendant who's responsible statistically? And I don't know that that is an appropriate mechanism, I think, under the tort law system. My point is that I think what the court of appeals, our South Carolina court of appeals, said in McCoy is exactly that, is that in identifying whether this defendant caused this injury, the fact that an expert said the 95 percent probability was sufficient to get it to a jury, that the directed verdict was improperly answered. What if the evidence in this case was that six of the truck guards went to the truck probe, but six went somewhere else, so it's even? How would that affect your case? That would affect it in a couple senses. It would certainly make it less likely, right, or less more probable, if I can say it that way, that truck probe was the one that was responsible. But it would still be a situation where we do have a connection between truck probe and South Carolina where there's no connection between trial mobile and South Carolina. You mean if it was a 50%? In Judge Agee's hypothetical there, it was a 50-50 chance that it was a particular defendant, and you would still be going after that particular defendant based on a 50-50 chance that they were the responsible party? If under your hypothetical there was also this difference between the connections between the two entities and the forum state like there is here. But no, if it's strictly 50-50, because that's the scenario they'll outline in the Ryan case, where you've got these two possible defendants, and the district court says, well, it's possible that the proper defendant is here, but it's just as likely that they're not. And that is not this case, because in that situation, there was 25 years ago, no one could tell, you know, it's a totally fungible product. That's not the situation here. We know exactly where this product originated. We know exactly, or we have more likely than not from the manufacturer itself how many were in the batch, that they went to distinct, two distinct locations, 10 to one, 83% to one, and 16% to the other, and to no other place. And then we have, within days, this connection between TruckPro and South Carolina that they're selling them to South Carolina buyers. All right. But at the risk of repeating some of Judge Niemeyer's questions, take it under your theory if five went to TruckPro, you would lose. If seven went to TruckPro, you would prevail. I don't think it's as simple as just looking at those pure numbers, because that's not strictly what we're relying on here. We're not relying strictly on the numbers. We do have a, we are able to start with the product itself and go back to the manufacturer, and the manufacturer gives us more evidence, records and testimony that links where these things then were shipped, and then we have the records from TruckPro showing the sales. All right. If you've got all that same evidence, and only five went to TruckPro in one example, and seven went in the other example, tell me what the difference is as far as your case is concerned. I think the seven is stronger than the five, but I think that it doesn't necessarily make the ultimate difference between those two cases. As to simply the question of whether it gets to a jury, right, just simply the question of whether a region of- Well, it's a question of holding the defendant responsible and bringing them to court. In other words, the question is do we summon people to court for torts, where the only statistics create a likelihood as opposed to any other evidence. And the question is, I'll give you even more complex, this is a fairly simple division, but what if you had 50 guards manufactured and they distributed it to four different distributors, none of which was a majority. So you could pick any one of them. You're talking about a plurality. This statistical business of holding people liable in court for something they may not have done simply because there's a statistical likelihood is foreign, I think, to our system. Well, I think the first part of your question, I'm thinking, Your Honor, goes to the concept of market share liability, and this is not a market share liability case. Market share liability is like those DES cases- I didn't characterize this as anything. I'm talking about relying on statistics to identify defendants. And I think that is an acceptable way of using circumstantial evidence to get a case to a jury. The way Your Honor phrased it is that you could get a case- So you think that based on speculation, basically, you can bring a lawsuit against a particular defendant and subject them to all that that entails in defending themselves? No, Your Honor. You don't have more than speculation. I disagree. Do you know for a fact that this guard was sold to the Turner Trucking? Do we know for a fact? We know more probably than not. But the answer is do we know for a fact? Did you say what? More probably than not? Then that's speculation. No, I disagree. And you don't know for a fact because Mr. Turner himself said he did not remember where he got- From whom he purchased it. From whom he purchased it. Right. But that's not a requirement for us. We don't have to prove from whom he purchased it. If you look, for example, the Sizemore case, which quotes from Madden v. Cox, the South Carolina Court of Appeals case, you must only prove more likely than not that it was in the hands of the defendant at some point. So we don't have to prove a direct sale to him. And that actually would be inconsistent with South Carolina statutory law. But it becomes a market share because he says he didn't know where it was purchased, and he also said a majority of his cab guards were purchased used from other people. They could have been from New England and from Tennessee and from Chicago. In other words, these truckers are interstate truckers probably or sometimes, but you don't know that either. And the question is, we're just sort of going into this big murky mire of tracing a particular product through used hands and multiple hands and saying because the manufacturer shipped it at the initial stage to a particular distributor, therefore that distributor is going to be responsible. Here's what we know from what Rodegeer testified to. There were only 12 cab guards, mostly from his perspective based on their records, that ever had that 448 stamp. Only 12 in the world. And 10 of them went to TruckPro. And so then TruckPro, within days of receiving that set of guards, starts selling them in South Carolina and sells them in South Carolina month after month after month. And the other two, the one that got the other two, there's no indication they ever sold any to South Carolina. No, it's no, you can't draw a negative conclusion. You don't know where they went. We don't, but we do know that 10 of them went.  I mean, a record is neutral on that. But the Honor's point is that we have to show definitively. I think we have to show some evidence that points to somebody as a defendant other than statistics. You know the blue bus hypothetical that all the academics do? You go down, a blue bus comes down and runs somebody off the road. And they don't know who drove the bus. They didn't stop the bus. And the blue bus company owns 80% of the buses in the city, blue buses. And somebody else owns the rest. Can you hold them liable? And all the academics say no. They say you need, what it is, is basically statistically finding defendants as opposed to having some evidence directly against the defendant. But I think if Your Honor were to say categorically that the statistical evidence can't be used as part of the equation, it would be inconsistent with at least two cases cited in our brief. What the court did in the Kramer case, which said ultimately they found that there were two possible providers of an airplane nut. 90% of it then came from one company, 10% of it came from another company. They reversed a summary judgment ruling. In Treston, a case from a New York court of appeals, there was a question of who provided the vinyl lining that was used in a pool liner. There was four possible providers. They narrowed it down to two. They could get 95% to one, 5% to the other. The court reversed a summary judgment motion in that case as well. And so those are both inconsistent. We'll have you back on rebuttal. Thank you, Your Honor. All right. I guess Mr. Gardner. May it please the court. Kenny Gardner on behalf of the respondent, TruckPro. I'm going to address the issue that this court has paid most attention to in the identification of this particular product. And I think Your Honor has it correct, is that it's pure speculation. What they're doing is they're saying that because we purchased 83%, potentially 83% of a product, that we therefore sold 83% of that product to the end user. But that's not the case here. The leap is unsupported by the evidence. The manufacturer themselves say we can't tell which one of these cab cars that were made on this date went to TruckPro or to TrailMobile. They have no idea. They say all we can tell from the information that we have is the date of its manufacture. Now, there's a part number on these for this model of cab car, but it's not limited to the cab cars here that are stamped with a 448. That part number that RoadGear uses and that was on the invoices sent by TruckPro to South Carolina is for every single one of those models, regardless of when it was manufactured. So here they make a lot about this. Oh, well, we've got evidence of them selling cab cars into South Carolina. Well, that part number doesn't distinguish whether or not it was. I thought the part number was a date. No, that's the distinguishing mark on the actual cab car. But the cab car itself is a model, so. It's the 448. What's the 12 he was talking about? Is that the 448? Yes. He said there were only 12 in the world or something. Well, that's not the testimony. The testimony is from RoadGear that it is possible that there were more, and it was possible that they kept a stock back so that they may not have sold all of them. But, again, that makes it that much more speculative here because that part number, although the same as it shows on these invoices. On the 12, on the 10 that went to TruckPro, is there evidence in the record that all of those were sold? No, Your Honor. There's none. There's no evidence that one of them was sold. And that's the issue here, and I think this Court goes right to it, is that you've got to have more. This percentage of we purchase and not distribute is not enough. That by itself is not enough, especially when the end user, Mr. Turner, doesn't know where he got it from. Well, your colleague said that TruckPro distributed it to distributors in South Carolina. Is there evidence in that? Not that it's one of these 448s, right? Again, that goes back to that part number. So from the record's point of view, those truck guards could still be an inventory. Correct. It's completely speculative because a jury would have to guess that one of those invoices with that part number meant that it was one of those that was a 448 stamp. And then they would have to guess that it was sold in South Carolina. So on the invoice, then, it has the part number. I mean, is this what the records show? It has the part number, but it doesn't have the date stamp of the manufacturer. Correct. And again, Road Gear manufactures an innumerable amount of this model of tab guard. The distinction here is that these 12, these alleged 12, were stamped with the manufacturer date. So that part number does not narrow the field. So, again, is this a cab guard? Is it fastened to the trailer or to the cab? It's fastened to the cab. To the cab. So it's bolted on the back of the cab. I was just wondering as I was reading this record why trailers don't come automatically with cab guards built onto the trailer so that the load can't shift forward. I'm putting a steel barrier there. I guess that's not so, is it? Well, one of the reasons that Mr. Turner says he buys and uses it, they're so expensive. So, presumably, excuse me, it's too expensive to add these things. I don't know the answer to that, Your Honor. But what I do know. It's a curiosity. It's nothing. But here, where Mr. Turner, who owns an interstate timber transportation business, says, I don't know where I bought this. I bought them used and I bought them from individuals. That's the only testimony. They cite to the Kramer v. Weedhopper case, but that case actually is in our favor. In Kramer v. Weedhopper, you have the end user who was injured, the plaintiff. There's testimony that he purchased it from Weedhopper, who was the seller. Weedhopper got its product from two different distributors. Those distributors got it from one manufacturer. The testimony from the store that sold that kit with that screw says we bought 90 percent of our product from this distributor and 10 percent from the other distributor, and that the distributor that we bought 10 percent from was only used on prototypes. So the court said, realistically, and very rightly so, that in that situation, they showed that that distributor, A, more than likely, or by the proponent, they had enough evidence to identify the probable defendant in that case. Here, if we were comparing the facts, you have the manufacturer. The 10 percent in that case, then, was whatever the thing was, did not enter into retail sales. You said it was used in a prototype, so it was not the 10 percent was not used for retail sales to the public. It just said the case just said prototypes, but it also said that it would use those for special orders when they didn't have any other ones. But, again, I think the point in that case is that there is evidence there that you could identify the distributor. Here, all you have is manufacturer to distributor, huge gap, end user. In all of the cases in South Carolina, they've been dealing with this issue since 1940. Well, it's a tort law problem. I mean, the academics have been dealing with it, too. It's not unique to any given state, I don't think.  We're under a general system of torts. Probably a restatement of torts is probably closely followed in most states. I agree with that. And as a practical sense, you have to have those links connecting the defendant with the product. In the Gantt versus Coca-Cola of Columbia case, it's much like the Kramer case. The injured party knew that he bought the bottle of Coke from a store. That store had records and had testimony and evidence that it bought its supply from this Coca-Cola distributor in Columbia. And the bottle in that case had Columbia on it. We don't have any of those links here. The gap between the end user and where they can last trace the potential sale of these things is just far too great. So the lower court was correct in ruling that there was an absence of evidence to establish that we put the truck probe, put the cab barge into the stream of commerce. And it was accurate in saying that any determination would be purely speculative. They have to do more in order to get there. Another case that I think is on point is Holmes versus Narco, which was in the South Carolina District Court, where that court outlined ways that courts have used to identify a manufacturer or a seller. You have the chain of evidence or chain of sale. You have uniqueness of the product. You have control of the product. And then you have bill of sale, those types of things. And in that case, the judge, the court says it is the plaintiff's burden to prove that a defendant or alleged defendant either sold, controlled, or otherwise put a product into the stream of commerce. And in that case, there was no evidence. And the court said you cannot shift that burden onto the defendant. So when the plaintiff says, well, truck probe never proved that it wasn't theirs, well, it's not our burden. A truck probe never proved where the Trail Mobile cab cars went. That's not truck probe's burden. That's the plaintiff's burden to prove. And there's nothing in the record that would establish that he is able to prove that here. Anything else? Okay. I think Your Honor had it all. Thank you. We'll hear from Mr. Waring. Thank you, Your Honor. At the risk of being redundant, I think this case really boils down to a couple of things. Probability versus possibility is one it boils down to. 83.3% is nothing but a red herring. And lastly, proof connecting the defendant, this defendant, truck probe, with the offending instrumentality is necessary. And it is the plaintiff's burden to do that. They have failed in that burden. The record contains no evidence that we, truck probe, put this particular product, the offending product, the one that injured Mr. Chappell and damaged Mr. Chappell, that that came from truck probe. And it's just a failure of proof here, Your Honor. And I agree with you, the 83.3% is great on how many units went to truck probe, but it has nothing to do with whether one of those units injured Mr. Chappell. I'm happy to answer any other questions you may have. Thank you. Mr. Calloway. There's a couple of important points here. Can I ask you a question just before you get started? Yes, sir. There was a claim that there is no evidence that the units, the 10 units that went to truck probe, were ever sold. Do you agree the record doesn't show that? Your Honor, no. That would be inconsistent with the testimony of Road Gear and how this process actually works. No, I didn't want the process. I'm talking about these actual 10 units that were manufactured on 448. Is there evidence of where they went or whether they went anywhere? There is an admission by truck probe that they are a product reseller. They don't consume anything. I understand that. That's their business to resell. But I'm talking about is there evidence to show those particular units, because that's the guts of your case. You're trying to trace those units. Is there any question that those units, could there be, those units are still on the shelf at truck probe's inventory? There would be nothing, that would be completely inconsistent with their business model is what I would say. What's the evidence? You don't have any evidence. I just need to know, is there evidence of, do you have any deals of sales, shipping documents, or anything that show that the 10 were shipped at all? We don't have a specific tracing of one unit from the next to the other. That's true. But, again, we're dealing with most probably. We're dealing with what is. Well, you're most probably because they're in business to sell them. No, but beyond that. They did then sell within days of receiving them from road gear cab guards to South Carolina buyers. Where's the evidence that the 448 units went? You're making a generalization. You're jumping from their business model to, and trying to encompass these particular units. But, Your Honor, business model evidence is important under Rule 406. I understand. But I'm trying to ask you a question about the record, and the question is whether these particular units, there's evidence that these particular units were shipped from a truck truck. I think that's a reasonable inference that a jury could draw from all the evidence that is presented. The answer is no, right? If you're asking for, do those documents specifically say they're 448, that answer is no to that. Yes, Your Honor, that's true. But, again, when we're dealing with is there a question for the jury as to who is the most probable seller of that 448 unit, we know where it ended up. We know where it started. We know they had 10 of them. We know they're selling them to South Carolina. We know that, or we don't have any indication that Trail Mobile has ever sold them to South Carolina. We know that it's not their business model. You know, you say there's no evidence that Trail, you make a big deal, there's no evidence about what happened to Trail Mobile's purchases. But, yet, that's identical to your circumstance. You have no evidence that yours went to South Carolina. In other words, they could be on inventory, and the two could have gone to South Carolina from Trail Mobile. But the question is, is that more probable? On this record. But the question is, what is more probable? No, it isn't a question. The question is, what's the evidence show? But what kind of reasonable jury, with all of the inferences are to be drawn in our favor at the summary judgment stage. So Traybro comes in and says, you know, we're in the business, and we sell 40% of our products in South Carolina, and we sell 30% to North Carolina, and we serve 30% in Georgia. That would be a very different case. And so that would help you? No, that would be a very different case. That would be more evidence that this. That's what this record allows, because you do not have direct evidence as to where those units went. But I think the ultimate point where I'm disagreeing with Your Honor is that your suggestion is that we have to show that all inferences. I didn't say what you had to show. I wanted to – I'm trying to identify the evidence. If you can stick with me for a minute on the evidence.  We start with the evidence in the record. And the record evidence shows that TruckPro received 10 units. That's correct. And after that, we don't know where they went, based on tracing. Tracing, right. If Your Honor wants to turn court law into basically –  I'm asking what the record shows. Right. But, Your Honor, what they're basically asking the court to do is to give you a chain of sales from manufacturer.  That would be a good thing to do if you're going to hold TruckPro in. Right. But to require a full chain of sales from manufacturer all the way to end user is not consistent with South Carolina law. 157310, Section 2B says we can hold a defendant liable for – But you don't have any chain of sale. Your Honor, you're saying we're trying to hold you to a full chain of sale. You don't have any as far as I can see. But what we do have is evidence that there is a distinct marking on this device, that there's only 12 of them, that 10 of them went to this defendant, and that this defendant is selling them to South Carolina. And there's no evidence that the other defendant was selling – Well, there's no evidence that they sold them to South Carolina. That's a leap. You say that's their business model. I think that's a reasonable inference from the evidence that we see in the evidence. I don't know why they didn't sell them in North Carolina. But again, reasonable inference, Your Honor. Do we have to prove it absolutely to get to a jury? That's the question. Okay. I understand. All right. We'll come down and greet counsel and proceed on to it. Okay. And we'll take a short recess after we greet counsel. This honorable court will take a brief recess. Thank you.
judges: Paul V. Niemeyer, G. Steven Agee, Stephanie D. Thacker